UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES WEBBER,                          )
                                       )
            Plaintiff,                 )
                                       )
    vs.                                )        Case No. 4:08-CV-651 (CEJ)
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of Social Security,                    )
                                       )
            Defendant.                 )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I. Procedural History

On July 20, 2005, plaintiff James Webber protectively filed applications for
disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*,
and for supplemental security income (SSI) benefits under Title XVI of the Act, 42
U.S.C. §§ 1381 *et seq.*, (Tr. 44-47, 113-17), with an alleged onset date of August
1, 2004. After plaintiff's applications were denied on initial consideration (Tr. 32-
37), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 30).

The hearing was held on December 28, 2006. (Tr. 366-81). Plaintiff was
represented by counsel. The ALJ issued a decision on April 18, 2007, denying
plaintiff's claims. (Tr. 7-24). The Appeals Council denied plaintiff's request for
review on March 18, 2008. (Tr. 3-5). Accordingly, the ALJ's decision stands as the
Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 48 years old. (Tr. 366). He
completed the sixth grade and unsuccessfully took the General Education

Development test (GED) seven times. (Tr. 367). He was using a cane at the time of the hearing. (Tr. 369). Before moving to St. Louis, he lived in New Orleans with his wife and children.[1] (Tr. 373). Plaintiff previously worked as a sandblaster and painter, a baker, and a tool-room attendant. (Tr. 367).

Plaintiff testified that he was unable to work due to nerve problems that caused him weakness and pain. (Tr. 372). In particular, he testified, his fingers were weak and felt as if they were about "to bust at the tips." Id. The pain in his fingers interfered with his ability to manage buttons and zippers. (Tr. 376). In addition, he suffered from gout, had weakness in his right leg, and felt pain in his feet. (Tr. 369-70). He had been using a cane off and on for the three years preceding the hearing. (Tr. 375). He thought he could stand for ten minutes. (Tr. 376). Plaintiff stated that his "whole body" was "cramped" with pain, and he was weak. (Tr. 376-77). Plaintiff told the ALJ that he had suffered from extremely blurred vision for two years. (Tr. 368-69). A doctor told him that he had glaucoma, which plaintiff attempted to treat with marijuana. He subsequently underwent cataract surgery and this corrected his blurred vision. (Tr. 368). Plaintiff testified that he also had insulin-dependent diabetes. (Tr. 371-72).

Plaintiff testified that he received psychological treatment for depression and auditory and visual hallucinations. (Tr. 371). In response to a question about what he saw or heard, plaintiff answered, "Well, the devil. He's there." Id. His medication made him sleep for twelve or thirteen hours a night. Plaintiff testified that he had a poor memory, could not maintain attention and concentration, and found it difficult to accept directions from or associate with other people. (Tr.

_____

[1]Elsewhere, the record indicates that plaintiff moved to St. Louis following Hurricane Katrina. (Tr. 295).

375). When asked how he spent his time, plaintiff replied that he spent time with his neighbor's children and his grandson. Id.

Plaintiff stated that he was addicted to cocaine in 2001 or 2002. (Tr. 369). He had smoked cigarettes for more than 39 years, consuming at least a pack a day for ten years. (Tr. 370).

Gary Weimholt, a vocational expert, provided testimony in response to two hypothetical scenarios. In the first, he was asked about the employment opportunities for an individual, age 48, with a sixth-grade education; the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; the ability to sit, stand, or walk for six out of eight hours; the ability to understand, remember, and carry out at least simple instructions and nondetailed tasks; the ability to respond appropriately to supervisors and co-workers in a task-oriented setting, where contact with others was casual and infrequent; the ability to adapt to routine, simple work changes; and the ability to take appropriate precautions to avoid hazards. (Tr. 378). Mr. Weimholt testified that such an individual would not be able to return to his past relevant work. Id. Other jobs in the state and national economies that such an individual could do included bottle packer, assembler, and inspector.

In the second scenario, the vocational expert was asked to assume that the individual had the same physical limitations as in the first scenario with additional limitations consistent with those found by Rolf Krojanker, M.D., in a Mental Residual Functional Capacity questionnaire completed on November 3, 2006. (See below). According to Mr. Weimholt, such an individual could not return to past relevant work; nor were there other jobs available in the state or national economy such an individual could perform. (Tr. 379).

-3-

Plaintiff completed a Disability Report as part of his application. (Tr. 219-28). He listed the following disabling conditions: depression, diabetes, some loss of vision, gastric pain, glaucoma, hearing loss, and pain in his legs and hands. (Tr. 220). Plaintiff stated that these conditions began in late 2003 and rendered him unable to work in August 2004. Plaintiff reported that he worked as a sandblaster and painter for various employers between 1997 and 2004. The work required him to use machines, tools, or equipment, and use technical knowledge or skills. He frequently lifted 25 pounds; the heaviest weight he lifted was 50 pounds. He spent most of his day on his feet and in motion, sitting for no longer than 30 minutes in an 8-hour shift. (Tr. 221).

Plaintiff also completed a Function Report. (Tr. 131-38). He reported that his daily activities included attending prayer meetings, napping, and perhaps accompanying his wife to the store. (Tr. 131, 134). He stated that it was difficult for him to put on his pants and shoes, and that his wife helped him to bathe and prepared his meals. (Tr. 132-33). In response to questions about whether he did any house or yard work, plaintiff stated that he watered the plants. (Tr. 133). He indicated that he had no impairments in his ability to pay bills, use a check book, or count change, although he also wrote that his ability to handle money had changed since his illnesses: "sometime I can't if it is a 5 or 10 it get hard"; elsewhere, plaintiff indicated that his vision was poor even when he was wearing his prescription glasses. (Tr. 134-35, 138). Plaintiff stated that he had no interests and hobbies. In response to a question regarding things he liked to do with others, plaintiff wrote, "Pray, sing, talk." He attended church three or four times per week. (Tr. 135). He no longer attended bars or ball games, stating that he did not like being around unfriendly people. (Tr. 136).

-4-

Plaintiff described the following abilities as affected by his illnesses: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, remembering, and using his hands. He stated that he could walk a distance of about half of a block before he needed to rest for three minutes. His attention was unimpaired and he could follow written and spoken instructions. (Tr. 136). He stated that he got along well with authority figures and had no difficulties coping with changes in routine. In response to a question about how well he handled stress, plaintiff wrote, "Not good." He noted that he was afraid that he was going to die as a result of his medical conditions. (Tr. 137).

Plaintiff completed a second Function Report on January 7, 2005. (Tr. 155-61). He indicated that he was having difficulty with almost all activities, with the exception of talking and getting along with others. He identified pain as a significant factor limiting his activities.

A Third-Party Function Report was completed by plaintiff's sister, Brenda Wade, on January 8, 2006. (Tr. 128-130D). Ms. Wade indicated that plaintiff lived alone in an apartment. She spent time with plaintiff every day, reading the Bible and talking. He attended church but did not otherwise spend time with others. Ms. Wade identified plaintiff's hobbies as reading and playing checkers against himself. She also stated that plaintiff needed reminders to take his medication and required help with cooking, cleaning, dressing, and bathing. In terms of his ability to get along with others, Ms. Wade described plaintiff as becoming aggravated and as afraid of authority figures. According to Ms. Wade, plaintiff's condition affected his ability to kneel, bend, climb stairs, talk, see, understand, follow instructions, and get along with others. Ms. Wade stated that plaintiff needed encouragement to keep living.

### III. Medical Evidence

Plaintiff was seen for intake on March 18, 2005, at a clinic of the Jefferson Parish Human Services Authority in Louisiana. (Tr. 344, 361). He complained of depression as the result of multiple stressors, including physical problems, the loss of his job, and his wife's threats to leave him. He stated that his appetite was "O.K." but complained of broken sleep. Plaintiff denied suicidal or homicidal ideation. When asked about hallucinations, plaintiff made a vague reference to seeing people.

Erik Kramer, M.D., conducted an emergency medication review on March 22, 2005. (Tr. 343). Plaintiff stated that he had been depressed since he was first diagnosed with diabetes mellitus 18 months earlier. He also cited neuropathy and sexual dysfunction as factors affecting his emotional state. Plaintiff reported he was no longer able to work as a sandblaster and painter and, without income, he had been forced to withdraw his pension money and give up his car. Although his appetite was "o.k.," his sleep was "not good at all." He denied having hallucinations. Plaintiff told Dr. Kramer that he had not had any prior psychiatric treatment. He described himself as a social drinker. He had participated in treatment for marijuana use in 1992 and 2002 and denied any marijuana use during the preceding two years. Dr. Kramer's diagnostic impression was mood disorder, not otherwise specified, with major depressive episode and adjustment disorder to be ruled out. Dr. Kramer prescribed Buproprion,[2] group therapy, and a psychiatric evaluation. Id. Plaintiff began group treatment on March 29, 2005. (Tr. 344).

---

[2] Buproprion is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

Dr. Kramer conducted a psychiatric evaluation on April 19, 2005. (Tr. 341-42). He assessed plaintiff as demonstrating good judgment, with linear and goal-directed thought processes, and an improved and appropriate affect. Plaintiff reported that his sleep and appetite were both good. He denied any hallucinations. Dr. Kramer diagnosed plaintiff with major depressive episode and assigned a Global Assessment of Functioning (GAF)[3] score of 55.[4] Dr. Kramer renewed plaintiff's prescription for Buproprion.

A group therapy progress note dated May 18, 2005, indicated that plaintiff was experiencing headaches; his medication was changed to Effexor.[5] His mood was assessed as "alright." (Tr. 340). On May 31, 2005, plaintiff reported that he and his wife had separated. (Tr. 339). On June 28, 2005, plaintiff reported that he was not sleeping well and he expressed concern that his food was being poisoned. He stated that everything was "falling apart" and his mood was assessed as irritable. Dr. Kramer prescribed Geodon[6] as an additional medication. Id. On July 25, 2005, plaintiff expressed concern about leg pain and his vision. He

_____

[3]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[4]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[5]Effexor is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

[6]Geodon (ziprasidone hydrochloride) is a psychotropic drug indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 1801-03 (61st ed. 2007).

reported that he was sleeping 10 to 11 hours per night. He denied any delusional thoughts. Dr. Kramer reduced the dosage of Geodon. (Tr. 337).

Plaintiff was treated for hyperglycemia and blurred vision at the emergency department of Christian Northeast Hospital in Saint Louis, Missouri, on September 19, 2005. (Tr. 321-35). He reported that he had run out of his medications. (Tr. 323). He was discharged with prescriptions for insulin, Effexor, Glyburide,[7] and Geodon. (Tr. 328).

Plaintiff was seen by Michael Donahoe, M.D., of Ophthalmology Consultants, for treatment of cataracts on October 25, 2005. (Tr. 309). He underwent surgical correction on November 7, and December 5, 2005, resulting in significant improvement in his vision. (Tr. 312-14).

On January 24, 2006, Llewellyn Sale, Jr., M.D., completed a consultative examination of plaintiff. (Tr. 295-300). Plaintiff's chief complaints were identified as diabetes, visual problems and glaucoma, and depression. Dr. Sale noted that plaintiff was "very thin," and described him as constantly shifting position and struggling to answer questions. Plaintiff reported that he had lost 45 pounds since he was diagnosed with diabetes three years earlier. Dr. Sale described plaintiff's diabetes as "very poorly controlled." Plaintiff stated that he did not leave the house much, beyond attending church twice a week and going shopping with his daughter. He reported that he had smoked a pack of cigarettes a day for 38 years. He also reported that he had not consumed alcohol in the past three years.

---

[7]Glyburide is used to treat type 2 diabetes. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684058.html (last visited on September 4, 2009).

On physical examination, plaintiff complained of pain in his buttocks, the epigastrium,[8] and costovertebral[9] angle. Dr. Sale noted no abnormality of plaintiff's joints; he had full muscle strength bilaterally in the upper and lower extremities, and only a slight reduction in his grip strength. Straight leg raising was slightly decreased due to pain caused by stretching. Plaintiff used a cane because he felt as if his legs were "going to give out," but he experienced no tingling, burning, or numbness. Dr. Sale observed that plaintiff's gait was normal and opined that the cane was medically unnecessary.

Also on January 24, 2006, L. Lynn Mades, Ph.D., completed a consultative psychological evaluation. (Tr. 301-05). Plaintiff complained of erratic sleep patterns, stating that sometimes he did not sleep for days and other times he slept for the entire day. He reported being depressed as a result of losing his job, his wife, his friends, and his home. He acknowledged a history of alcohol abuse, but stated that it had been more than three years since his last drink. He acknowledged that had been treated in the past for cocaine and marijuana use. On examination of his mental status, plaintiff was found to have a depressed mood and restricted though appropriate affect. No preoccupations, thought disturbances, delusions, or perceptual distortions were noted. Plaintiff denied experiencing hallucinations or suicidal or homicidal ideation. Dr. Mades did not observe any impairment of plaintiff's memory and described him as oriented and able to perform simple calculations. Plaintiff demonstrated adequate attention,

---

[8]The epigastric region is an area of the abdomen located between the costal margins and the subcostal plane. See Stedman's Med. Dict. 1666 (28th ed. 2006).

[9]Relating to the ribs and bodies of the thoracic vertebrae with which they articulate. See Stedman's Med. Dict. 451 (28th ed. 2006).

concentration, and persistence, with somewhat decreased pace. His insight and judgment were assessed as fair. Plaintiff reported that he lived alone and was able to take care of his household chores and personal needs. He attended church and occasionally spent time with friends. He did not drive, although he held a driver's license. Dr. Mades noted that plaintiff had symptoms consistent with major depressive disorder for which medication had been helpful in the past. At the time of the evaluation, plaintiff had not been taking the full prescribed dose nor had he received psychiatric treatment since relocating from Louisiana. There was no evidence of a thought disorder at the time of the evaluation. Dr. Mades diagnosed plaintiff with major depressive disorder, single episode, mild, and assigned a GAF score of 75-80.[10] Plaintiff's prognosis was assessed as fair to good with appropriate intervention.

On February 13, 2006, plaintiff was seen for an initial appointment at the Washington University School of Medicine. (Tr. 283-91). He was diagnosed with diabetes mellitus, gastroesophageal reflux disease, and major depressive disorder/psychosis. (Tr. 290). He returned for follow-up care on March 17 and March 24, 2006. (Tr. 278-80, 268-71).

Plaintiff had an intake appointment at the Hopewell Center on March 28, 2006. (Tr. 254-63). Clinician Eric May, M.A., described plaintiff as mildly dysthymic, with flat affect, and suffering from difficulties with sleep. Plaintiff's speech was coherent

---

[10]A GAF of 71-80 corresponds with "transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

and he was oriented.  Mr. May diagnosed plaintiff with major depressive disorder and assessed a GAF of 45.[11]  (Tr. 254).  Mr. May  (Tr. 257).

Rolf Krojanker, M.D., completed a psychiatric evaluation on April 12, 2006.  (Tr. 251-52).  Plaintiff reported that he began hearing voices in 2002.  In particular, he heard "screaming baby talk as if the baby needs help," and the devil saying that a hurricane was coming.  He reported speaking to his deceased mother.  Plaintiff was diagnosed with prolonged postraumatic stress disorder, and "schizophrenia, pre-existing, or schizoaffective type," and mild mental retardation.  Plaintiff's GAF was assessed at 30.[12]  Dr. Krojanker saw plaintiff for follow up on June 21, 2006, when he reported he was "getting better."  He was noted to be "prescription compliant."  (Tr. 245).

Plaintiff received treatment for diabetes and gout at Grace Hill Neighborhood Health Center on May 3, June 2, June 21, July 21, September 18, and October 18, 2006.  (Tr. 230-40).

Dr. Krojanker completed a Mental Residual Functional Capacity Questionnaire on November 3, 2006.  (Tr. 246-50).  Dr. Krojanker diagnosed plaintiff with post-traumatic stress disorder and assessed a GAF score of 35.[13]  Dr. Krojanker stated

---

[11]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[12]A GAF of 21-30 corresponds with "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[13]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR  major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition,

that plaintiff exhibited the following signs and symptoms: decreased energy; blunt, flat, or inappropriate affect; generalized persistent anxiety; mood disturbance; persistent disturbances of mood or affect; change in personality; substance dependence; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; perceptual or thinking disturbances; and illogical thinking. Dr. Krojanker did not indicate that plaintiff suffered from hallucinations. (Tr. 247). Dr. Krojanker assessed plaintiff as seriously limited in his ability to perform the following tasks: understand, remember, and carry out very short and simple instructions; make simple decisions; ask simple questions or request assistance; get along with co-workers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; maintain socially appropriate behavior; adhere to basic standards of neatness; travel in unfamiliar places; and use public transportation. Dr. Krojanker assessed plaintiff as unable to meet competitive standards in the following areas: interact appropriately with the general public; remember work-like procedures; maintain attention for two-hour segment; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal work day and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 248-49). Dr. Krojanker indicated that plaintiff had a low IQ or reduced intellectual

_____

Text Revision 34 (4th ed. 2000).

-12-

functioning but failed to specify test results that supported this conclusion. (Tr. 249). Dr. Krojanker expressed no opinion with respect to whether plaintiff's psychiatric conditions exacerbated his pain or other physical symptoms. Plaintiff's impairments would cause him to be absent from work four days of each month. (Tr. 250).

Kyle W. DeVore, Ph.D., completed a Psychiatric Review Technique form on February 2, 2006. (Tr. 162-75). Dr. DeVore noted that plaintiff had been diagnosed with major depressive disorder, single episode, (Tr. 165), and with alcohol, cannabis, and cocaine dependence in sustained full remission (Tr. 170). Dr. DeVore assigned plaintiff a GAF of 75 to 80 (Tr. 174) and concluded that plaintiff's impairments were not severe. (Tr. 162).

## IV. The ALJ's Decision

In the decision issued on April 18, 2007, the ALJ made the following findings:

1.    Plaintiff met the disability insured status requirements of the Social Security Act.

2.    Plaintiff had not engaged in substantial gainful activity since August 1, 2004.

3.    The medical evidenced established that plaintiff had severe diabetes mellitus, pseudophakia, and major depressive disorder with polysubstance abuse in reported remission. He did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. His nonsevere impairment was subjective complaints regarding his legs and hands.

4.    Plaintiff's allegations regarding his impairments precluding all work were not credible based on inconsistencies in the record.

5.    The plaintiff can lift and/or carry twenty pounds occasionally and ten pounds frequently; can sit, stand and/or walk six hours out of an eight-hour work day; understand, remember, and carry out at least simple instructions and non-detailed tasks; respond appropriately to others in a task oriented setting where contact with others is casual and infrequent; adapt to routine/simple work changes; and take appropriate precautions to avoid hazards.

6.  Plaintiff was unable to perform his past relevant work as a sandblaster/ painter, tool room laborer, and baker.

7.  Plaintiff was 48 years old, which is defined as a younger individual.

8.  Plaintiff had six years of formal education.

9.  Plaintiff did not have any acquired work skills which were transferrable to the skilled or semiskilled activities of other work.

10. Considering the types of work which plaintiff is still functionally capable of performing, in combination with his age, education, and work experience, plaintiff could be expected to make a vocational adjustment to work which exists in significant numbers in the national economy.

11. Plaintiff was not under a disability, as defined in the Social Security Act, at any time through the date of the decision.

(Tr. 23-24).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989).  The

ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

B.    Analysis

Plaintiff's allegations of error attack the ALJ's determination of plaintiff's Residual Functional Capacity (RFC); his assessment of plaintiff's credibility; and the accuracy of the hypothetical posed to the Vocational Expert.

1.    The ALJ'S RFC Determination

The ALJ determined that plaintiff retained the RFC to perform work that existed in the economy.  Plaintiff contends that the ALJ improperly discounted Dr.

Krojanker's assessment of plaintiff's mental impairments and thus reached an improper conclusion regarding plaintiff's RFC. Plaintiff also asserts that the ALJ failed to adequately develop the record of Dr. Krojanker's treatment.

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff argues that the ALJ erred by discounting Dr. Krojanker's opinion. The amount of weight to be given to a medical opinion is governed by several factors, including: whether the source of the opinion has treated the claimant and, if so, the length of the treatment relationship, the frequency of treatment, whether the source supports the proffered opinion with relevant medical evidence, whether the opinion is consistent with the medical record as a whole, and whether the source is a specialist. 20 C.F.R. § 404.1527(d).

Dr. Krojanker opined that plaintiff was disabled as a result of post-traumatic stress disorder and a provisional diagnosis of schizoaffective disorder. The ALJ rejected this assessment. First, the ALJ noted, Dr. Krojanker had very limited contact with plaintiff before completing the RFC on November 3, 2006. The record

contains notes of a 45-minute contact on April 12, 2006 and a 15-minute contact on June 21, 2006; Dr. Krojanker's RFC refers to two other 15-minute sessions, but the notes of those sessions are not included in the record. Because the record indicates that the treatment relationship was quite limited, the ALJ was not required to afford Dr. Krojanker's opinion substantially greater weight than that of the consultative examiners. See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (ALJ did not err in refusing to give treating-source weight to doctor who met with claimant three times). The ALJ also found that Dr. Krojanker's assessment was inconsistent with the rest of the medical record, including his own treatment notes of June 21, 2006, at which he assessed plaintiff as stable. Furthermore, Dr. Krojanker's diagnoses were at odds with those assigned by other physicians. A review of plaintiff's overall treatment record indicates that he only sporadically reported experiencing hallucinations and, upon occasion, affirmatively denied such experiences. Significantly, Dr. Krojanker did not provide any clinical findings or written explanations to support his assessment of plaintiff's limitations despite being asked to do so, and the ALJ was not required to accept his unsupported and conclusory assessment. Plaintiff argues that Dr. Krojanker's assessment is supported by the findings of Drs. Kramer and Mades that he suffered from a mood disorder or major depression. The ALJ credited these diagnoses and found that plaintiff suffered from depression. The ALJ also noted, however, that plaintiff's symptoms were well controlled when he took medication as prescribed. The ALJ did not err in his assessment of the weight due to Dr. Krojanker's RFC determination under § 404.1527(d).

Plaintiff also asserts that the ALJ did not fulfill his obligation to develop the record. The Court disagrees. Before he issued the decision, the ALJ sent Dr.

Krojanker a form letter seeking additional information. The letter indicated, *inter alia*, that Dr. Krojanker's statement contained conflicts, could not be reconciled with the medical evidence in the record, and did not contain all information necessary to assess the severity of plaintiff's impairments. (Tr. 66). Dr. Krojanker did not respond to the ALJ's letter. Additionally, plaintiff noted that Dr. Krojanker's records were incomplete when he filed them and there is no indication that plaintiff attempted to obtain the missing records himself. Under this circumstance, the Court cannot say that the ALJ committed error with respect to developing the record.

## 2. The ALJ's Credibility Determination

The ALJ found that the medical evidence did not support plaintiff's allegations regarding the intensity or persistence of his pain or its effect on his ability to work.

"In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ

is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir.2002)). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Where an ALJ explicitly considers the Polaski factors and discredits the plaintiff's complaints for good reason, the courts will normally defer to that decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001), (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

The ALJ found that objective evidence did not support plaintiff's claims that he was disabled due to weakness, nerve problems, or diminished vision. There is no dispute that plaintiff's vision was corrected by cataract surgery in late 2005. While the record demonstrates that plaintiff frequently presented with high blood sugar, these occurrences coincided with times when he was not taking his medication. His claims of weakness were contradicted by findings that he had a normal gait, full ranges of motion, and full strength in all major muscle groups. Similarly, plaintiff's claims that he had impairments of memory and attention were contradicted by assessments completed by Dr. Kramer in 2005 and Dr. Mades in January 2006. Furthermore, in the August 2005 function report, plaintiff stated that he was good at following instructions, and was able to pay his own bills and handle money. In addition, plaintiff was inconsistent in his compliance with prescribed medication, a factor that the ALJ may properly consider in assessing his credibility. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). The ALJ also dismissed as not credible plaintiff's claims that he had severely limited daily activities. Finally, the ALJ noted that plaintiff's work history was not "helpful" on the issue of credibility:

plaintiff claimed that he had last worked in August 2004 but the last year in which he earned at the substantial gainful activity level was 2002.[14]  The record shows that the ALJ properly considered the Polaski factors in assessing plaintiff's credibility.

### 3.    The ALJ's Hypothetical

In his final allegation of error, plaintiff contends that the ALJ should have included the limitations found by Dr. Krojanker in the hypothetical he posed to the Vocational Expert.  As discussed above, the ALJ properly gave Dr. Krojanker's opinion little weight and thus was not required to include his findings in the hypothetical.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#17] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

---

[14]A wage report indicates that plaintiff's annual wages increased steadily between 1978 and 1988; he had very low earnings from 1992 through 1995 and thereafter earned increasing amounts until 2002.  (Tr. 101).

-21-

Dated this 4th day of September, 2009.